[Cite as *State v. McCall*, 2020-Ohio-84.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                                    :

    Plaintiff-Appellee,                          :

                                      No. 18AP-871

v.                                                               :        (C.P.C. No. 17CR-2365)

Dominic O. McCall,                                      :        (REGULAR CALENDAR)

    Defendant-Appellant.                      :

---

D E C I S I O N

Rendered on January 14, 2020

---

**On brief**:  *Ron O'Brien*, Prosecuting Attorney, and *Barbara A. Farnbacher*, for appellee. **Argued:** *Barbara A. Farnbacher*.

**On brief**:  *Yeura Venters*, Public Defender, and *Ian J. Jones*, for appellant. **Argued:**  *Ian J. Jones.*

---

APPEAL from the Franklin County Court of Common Pleas

BEATTY BLUNT, J.

{¶ 1} Defendant-appellant, Dominic O. McCall, appeals a judgment from the Franklin County Court of Common Pleas denying his motion to suppress. Because the officers' initial approach toward McCall's vehicle was a consensual encounter, we affirm the trial court's decision.

## I.  FACTS AND PROCEDURAL HISTORY

{¶ 2} McCall was indicted for one count of possession of cocaine, a felony in the fifth degree, in violation of R.C. 2925.11, after officers found a baggie of crack cocaine in his pocket during a pat-down.

No. 18AP-871

{¶ 3} McCall filed a motion to suppress on November 7, 2017, arguing that the police officers conducted an illegal stop and search of his person and his car. The trial court held a hearing on the motion on March 29, 2018.

{¶ 4} Three witnesses testified at the suppression hearing: Columbus Police Officers Nicholas Powell and Tyler Wells, and appellant McCall. Officer Powell testified that he and his partner, Officer Wells, were working a summer safety initiative, whereby they "would just go out in the community and do proactive police work to try to fight crime." (Mar. 29, 2018 Tr. at 6.) This involved the officers having "consensual encounters" with the community to try to get guns and drugs off the street. (Tr. at 6.) In the course of these consensual encounters, Officer Powell testified that they would "just casually approach someone, make sure that they're not under any impression that they're detained at that time and they're free to go and then just try to obtain probable cause during that." (Tr. at 6.) Officer Powell testified that they will search individuals if they have probable cause to do so, and they are looking for both guns and drugs as part of the summer safety initiative.

{¶ 5} In the course of that initiative, on June 15, 2016, Officer Powell testified that he and Officer Wells pulled into the Shop-N-Go convenience store and parked their marked cruiser in a parking spot. They immediately smelled marijuana coming from the front of the building. They noticed McCall sitting in his vehicle, which was parked in a parking spot, and they approached the vehicle. Officer Powell stated that their police cruiser was not blocking McCall's vehicle during their encounter. Wells approached the driver's side, and Officer Powell approached the passenger's side "just to engage [McCall] in casual conversation." (Tr. at 9.) According to Officer Powell, they approached McCall because they knew from "previous arrests and experience" that people often sit in their cars like McCall was doing to "buy, sell, or use narcotics." (Tr. at 9.) Officer Powell testified that the

officers "walked up from either side as to not be behind [McCall] so [they] would not get struck by the vehicle," and that had McCall backed up, he "would have been free to just continue backing and then go about his direction pulling out of the lot." (Tr. at 14.) McCall's window was down when the officers approached him, and Officer Powell testified that Wells "could immediately smell raw marijuana coming from the inside of the vehicle where Mr. McCall was sitting in the driver's seat." (Tr. at 10.) The officers "crouched down" next to the car, "leaning towards it." (Tr. at 15.) According to Officer Powell, the officers were standing back enough "to where there'd still be room to where if he would have started to move the vehicle, [they] would not be struck." (Tr. at 16.) McCall's mirror "could have potentially" hit the officers if McCall reversed, but Officer Powell believed "it would not have caused serious physical harm." (Tr. at 16.) Officer Powell maintained that McCall still could have left at that point, and the officers "never made any statements to him that he was detained." (Tr. at 16, 17.) McCall did not attempt to leave.

{¶ 6} Officer Powell admitted the officers did not have reasonable suspicion of criminal activity when they began approaching the vehicle. He testified that they did not have any reason to detain McCall until they began speaking with him. Officer Powell clarified they smelled burnt marijuana coming from the front of the store, and raw marijuana coming from McCall's car. It was at the point that Officer Powell's partner smelled raw marijuana coming from the car that Officer Powell believed McCall was no longer free to leave.

{¶ 7} When the officers began speaking with McCall, they asked him if he had marijuana in the car, and he said no. Officer Powell testified that the officers then "pull[ed] him out of the car" and conducted a "pat-down for weapons due to the smell of marijuana." (Tr. at 10.) Officer Powell did not believe that McCall was a danger to the officers.

No. 18AP-871

According to Officer Powell, "drugs and guns go hand in hand," so the officers "had reason to believe that [McCall] could have been armed at the time." (Tr. at 20.)

{¶ 8} Officer Wells testified next. He testified that he and Officer Powell were engaged in the summer safety initiative on June 15, 2016. He and Officer Powell stopped at the Shop-N-Go every day because they had made numerous gun and drug arrests at that location. On June 15, they pulled into a parking spot and smelled marijuana from in front of the store when they got out of the cruiser. When asked why the officers park in a parking spot, Officer Wells answered:

> Because we were just going out and talking to individuals in the Shop-N-Go. We weren't detaining anybody. We weren't stopping any vehicles from leaving. We weren't blocking any egresses. So we would just park the cruiser like any other patron would of the store.

(Tr. at 28.) He said they approached McCall's vehicle "[b]ecause it was occupied," and there was a "smell of marijuana coming from the area." (Tr. at 29.) It was the only vehicle in the area that was occupied. According to Officer Wells, "it was very apparent as soon as [they] walked in that parking lot that [they] smelled the odor of raw marijuana." (Tr. at 31.) Officer Wells testified that he and Officer Powell approached McCall's vehicle on each side, and McCall's window was down. Wells was not able to testify with certainty whether he or Officer Powell ever walked behind McCall's car in their approach. Officer Wells testified that McCall could have backed his car up without hitting Officer Wells, either with the car itself or the car mirror, when the officers were approaching the car and when they were talking with McCall. Even though there was another car parked in the spot next to McCall's car, there was plenty of room between Officer Wells and McCall's car. He testified further that he did not lean into the window. Rather, he "just tried to engage in casual conversation with him just walking by, and that's when [he] got the smell." (Tr. at 37.)

No. 18AP-871

{¶ 9} According to Officer Wells, the smell of raw marijuana got stronger the closer he got to McCall's car. He believed it was most likely coming from McCall's vehicle "because it was coming straight from that window that was open." (Tr. at 31.) Officer Wells told McCall that the officers smelled marijuana and asked if he had any in the car. Officer Wells thought McCall answered no. McCall did not attempt to put the car into gear. Because Officer Wells "determined that the smell was coming from the vehicle," he testified that he "asked Mr. McCall to step out of the vehicle to do a pat-down for weapons." (Tr. at 32.) McCall got out of the car, and Officer Wells conducted the pat-down. Officer Wells testified that he felt a lump, consistent with a baggie of marijuana, in McCall's jacket pocket, and he removed it. It did not feel like a weapon. The baggie contained marijuana, and there was a baggie of crack cocaine tied to it. After that, they handcuffed McCall and placed him in the police cruiser.

{¶ 10} McCall testified next, disagreeing with much of the officers' testimony. He indicated that he was not parked in front of the Shop-N-Go, but was actually parked a few doors down from it. McCall testified there were no cars parked next to him. But, he said, the officers parked "directly behind [him]." (Tr. at 42.) There was "[n]o way whatsoever" that he was able to drive away. (Tr. at 43.) He did not believe he could leave. He saw one of the officers approach through his rearview mirror. According to McCall, he had both windows up and he was smoking a cigarette when one of the officers knocked on his window and told him they smelled marijuana coming from the car. McCall said he did not roll his window down when he first responded to the officer, but he eventually rolled it down. He noticed "two more cruisers coming into the parking lot," and those cruisers "surrounded" him. (Tr. at 44.) Additional officers, "at least six," were there, and he remembered talking to "about four different cops." (Tr. at 44, 45.) McCall was placed in the back of one of the

cruisers, and he testified that an officer told him that they were looking for someone in connection with a murder investigation. While he was in the back of the cruiser, officers searched his vehicle.

{¶ 11} McCall did not recall any odor of marijuana in the parking lot. He denied having any marijuana on him. He did not recall but did not think he would be wearing a jacket in June. He admitted that the officer pulled crack cocaine out of his pocket.

{¶ 12} The parties submitted post-hearing briefs on the motion to suppress. Thereafter, on May 14, 2018, the trial court denied the motion. The trial court "did not find the testimony of the Defendant to be credible." (May 14, 2018 Decision at 1.) The court found that the officers parked their cruiser in a parking spot that did not block McCall's movement. The evidence showed that the officers noticed a smell of marijuana in the vicinity of McCall's vehicle and approached the vehicle to initiate a casual conversation. The court further found that Officer Wells approached the vehicle from the side. Based on these facts, the court found that the officers' initial encounter with McCall was consensual, such that there was no seizure requiring reasonable suspicion. The increasing smell of marijuana as they approached the car provided probable cause to search McCall and the vehicle.

{¶ 13} Following the trial court's denial of his motion to suppress, McCall entered a no contest plea. The trial court found McCall guilty and sentenced him to 3 years of community control, stayed pending appeal. McCall will receive a 12-month prison sentence if he violates a provision of community control.

{¶ 14} McCall appeals the trial court's denial of the motion to suppress.

## II. ASSIGNMENT OF ERROR

{¶ 15} McCall presents the following assignment of error:

No. 18AP-871

> The trial court erred in denying appellant's motion to suppress evidence, as police illegally detained appellant before reasonable suspicion of criminal activity existed and before Officer Wells smelled marijuana emanating from the car.

## III. STANDARD OF REVIEW

{¶ 16} Appellate review of a trial court's decision to deny a motion to suppress involves a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. The trial court is in the "best position to resolve factual questions and evaluate the credibility of witnesses." *Id.*, citing *State v. Mills*, 62 Ohio St.3d 357, 366 (1992). Therefore, appellate courts afford deference to the trial court's factual determinations and accept such determinations if they are supported by "competent, credible evidence." *Id.*, citing *State v. Fanning*, 1 Ohio St.3d 19 (1982). We "must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706 (4th Dist.1997).

## IV. LAW AND ANALYSIS

{¶ 17} McCall contends the officers conducted an investigatory stop without reasonable suspicion of criminal activity when they approached his car. The state contends that the officers' initial encounter with McCall was a casual, consensual encounter. McCall does not argue that the officers lacked reasonable suspicion to conduct a detention, pat-down, and investigative search after they smelled marijuana coming from the car. He concedes that the officers "obtained probable cause" during their encounter with him. (Appellant's Brief at 21.) He argues only that the officers' initial approach towards his vehicle was not a consensual encounter but rather an investigatory stop.

No. 18AP-871

{¶ 18} The Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution prohibit the police from conducting warrantless searches and seizures unless an exception applies. *State v. Mendoza*, 10th Dist. No. 08AP-645, 2009-Ohio-1182, ¶ 11, citing *Katz v. United States*, 389 U.S. 347, 357 (1967). But " 'not all personal intercourse between policemen and citizens involves "seizures" of persons.' " *State v. Jones*, 188 Ohio App.3d 628, 2010-Ohio-2854, ¶ 11 (10th Dist.), quoting *Terry v. Ohio*, 392 U.S. 1, 19 (1968). " 'Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred' within the meaning of the Fourth Amendment." *Id.*, quoting *Terry* at 19.

{¶ 19} " 'The law recognizes three types of police-citizen interactions: 1) a consensual encounter, 2) a brief investigatory stop or detention, and 3) an arrest.' " *State v. Dickman*, 10th Dist. No. 14AP-597, 2015-Ohio-1915, ¶ 9, quoting *State v. Millerton*, 2d Dist. No. 26209, 2015-Ohio-34, ¶ 20. The first category, a consensual encounter, requires no objective justification. *Jones* at ¶ 12, citing *Florida v. Bostick*, 501 U.S. 429, 434 (1991). It does not constitute a seizure or detention and does not implicate the Fourth Amendment's protections. *Bostick* at 434. A brief investigatory stop must be supported by a reasonable suspicion that criminal activity is afoot. *Jones* at ¶ 13, citing *Terry*. An arrest must also be supported by probable cause. *Id.*, citing *Brown v. Illinois*, 422 U.S. 590 (1975).

{¶ 20} We have explained the analysis in determining what constitutes a consensual encounter versus a detention as follows:

> In determining whether a particular encounter constitutes a "seizure," and thus implicates the Fourth Amendment, the question is whether, in view of all the circumstances surrounding the encounter, a reasonable person would believe he or she was "not free to leave" or "not free to decline the

No. 18AP-871

> officers' requests or otherwise terminate the encounter." *United States v. Mendenhall* (1980), 446 U.S. 544, 554 []; *Florida v. Bostick* (1991), 501 U.S. 429, 439 []; *Michigan v. Chesternut* (1988), 486 U.S. 567, 573 []; *Florida v. Royer* (1983), 460 U.S. 491, 502 [] (plurality opinion). "[T]he crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.' " *Bostick*, 501 U.S. at 437 [], quoting *Chesternut*, 486 U.S. at 569 []. Where the encounter takes place is a factor in deciding whether it constitutes a "seizure" for purposes of the Fourth Amendment. *Bostick*, 501 U.S. at 437 [].

*Jones* at ¶ 12.

{¶ 21} Similarly, the United States Supreme Court has stated:

> a seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free "to disregard the police and go about his business," *California v. Hodari D.*, 499 U.S. 621, 628 [] (1991), the encounter is consensual and no reasonable suspicion is required.

*Bostick* at 434. The court went on to explain:

> law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions.

*Id.*, quoting *Florida v. Royer*, 460 U.S. 491, 497 (1983) (plurality opinion). Plainly, "mere police questioning does not constitute a seizure." *Id.* But it is important that the officers "do not convey a message that compliance with their requests is required." *Id.* at 435. The "crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.' " *Id.* at 437, quoting *Michigan v. Chesternut*, 486 U.S. 567, 569 (1988).

No. 18AP-871

**{¶ 22}** Under this standard, an officer may have a consensual encounter when he approaches an individual seated in a parked car and engages in a casual conversation. *See State v. Carter*, 2nd Dist. No. 19833, 2004-Ohio-454; *State v. Schwab*, 12th Dist. No. CA2000-07-055, (Jan. 29, 2001), *8 ("approaching the occupants of a parked car to ask questions does not constitute a seizure. The fact that the officer shined the spotlight into the car does not change the analysis, nor does the fact that the officer parked at an angle behind the vehicle."); *State v. Massey*, 10th Dist. No. 12AP-649, 2013-Ohio-1521 (consensual encounter where the officer approached the car after using her cruiser's spotlight to illuminate it; the car was already parked, the officer did not activate the cruiser's lights or siren, and the officer merely asked the occupants to keep their hands in view while she approached the car.); *State v. Adams*, 10th Dist. No. 18AP-330, 2019-Ohio-1323 (consensual encounter where the officers parked so as not to block the defendant's car, did not activate their lights or siren, and approached the defendant's parked car on both sides).

**{¶ 23}** McCall argues that a reasonable person would not feel free to leave when two officers approach his car from behind and then both sides such that the person's only means of egress is to back out and potentially hit an officer. McCall contends that his path was blocked.

**{¶ 24}** But the trial court found that McCall was not blocked in and was not prevented from leaving when the officers approached his vehicle. That factual determination is supported by competent, credible evidence, namely the testimony of two officers. The court found McCall's contrary testimony was not credible. We defer to the trial court's factual findings on that issue.

**{¶ 25}** Applying those facts to the legal standard, the officers' initial approach did not amount to an investigatory stop or detainment. The officers did not initiate a stop;

McCall was already parked. The officers did not turn on their lights or sirens. They did not block McCall's egress with their car. The officers approached McCall's car as he was sitting in it and began to engage in a casual conversation with him. While they were approaching the vehicle, the officers never indicated to McCall that he was not free to leave, and their conduct in walking up to the sides of his car was not negligent or in violation of his rights. Wells, the officer who approached McCall's vehicle from the driver's side, testified that he began to smell marijuana coming from McCall's vehicle *as he was approaching it*:

> So when I got closer to the vehicle, I could smell the odor of raw marijuana coming from out of that vehicle. As I approached, it got stronger. So I -- I knew that, hey, it's most likely in this vehicle because it was coming straight from that window that was open.

(Tr. at 31.) When he was approaching the vehicle, Officer Wells testified that McCall would not have hit him had he started backing up. By the time he got up to the driver's door, though, Officer Wells testified that he could have initiated a stop due to the marijuana smell.

{¶ 26} Officer Powell was the only officer who testified that McCall's side-view mirror could have struck him if McCall tried to reverse the car. At that point, though, Officer Powell was already at the vehicle, crouched down, leaning next to it. Officer Powell testified that when the officers were still approaching the vehicle, they would not have gotten struck by it. Based on the officers' testimony, at the only point in time Officer Powell testified that McCall's mirror could have hit him is when the officers were already stopped and stationary next to the vehicle's windows. At this point, based on testimony from Officer Wells, the officers already had reasonable suspicion to conduct an investigatory stop because Officer Wells smelled marijuana coming from the vehicle as they approached it.

{¶ 27} There is no testimony that McCall's vehicle or its mirror would have hit either officer while they were still approaching the vehicle, before Officer Wells developed

No. 18AP-871

reasonable suspicion to conduct an investigatory stop. This is a consensual encounter; there was no seizure or detention that would implicate the Fourth Amendment. In the course of the officers' interaction with McCall, the officers noticed a smell of raw marijuana that gave rise to reasonable suspicion and the basis to initiate an investigatory detention. Before the officers smelled the marijuana coming from McCall's car, however, the interaction was a consensual encounter. We, therefore, overrule McCall's sole assignment of error, and we affirm the judgment of the Franklin County Common Pleas Court denying his motion to suppress.

*Judgment affirmed.*

NELSON, J., concurs.
BRUNNER, J., dissents.

BRUNNER, J., dissenting.

{¶ 28} I generally agree with the statements of law set forth by the majority and also the majority's decision to accord deference to the trial court's credibility determinations. However, taking the officers' testimony at face value, I nonetheless conclude that a reasonable person in McCall's position would not have felt free to leave before Officer Wells reached the driver's side window and smelled marijuana coming from the vehicle. I would find as a matter of law from all the testimony in the record that an unsupported seizure occurred before there existed probable cause. Thus, I would reverse on that ground and respectfully dissent.

{¶ 29} Both officers testified that, as part of their summer patrol on June 15, 2016, they parked in a marked space near the Stop-N-Go market. (Hearing Tr. at 7-10, 25-28, filed Dec. 26, 2018.) McCall's car was in a marked space directly in front of the market and his only means of egress was to reverse his vehicle and turn it left or right in order to drive

through the parking lot to its exit. *Id.* at 18, 30-32. Both officers also testified that they approached McCall's vehicle on foot from the rear of the vehicle, with Officer Wells on the driver's side and Officer Powell on the passenger side. *Id.* at 18, 35-36. Much of the focus in this case and by the majority has been on the testimony of Officer Powell who admitted that, when he approached McCall's car, he was close enough to it that, had McCall reversed, he could have been struck by the passenger mirror. *Id.* at 15-17.

{¶ 30} The majority is ultimately not affected by Officer Powell's testimony about the risk from the mirror because it concludes that probable cause developed before Powell came near the mirror. But I do not agree that the record supports this factual premise. While Officer Wells testified that he smelled marijuana from the open window of McCall's vehicle as he approached (Hearing Tr. at 31), he clarified on cross-examination that he did not actually realize he smelled marijuana *from McCall's car* until he had *arrived* at the driver's side window:

> Q. Okay. So it's your testimony that even though there was a car parked on the driver's side of Mr. McCall's vehicle and you approached from that side, he could have backed up while you were approaching and he wouldn't have hit you?
>
> A. Correct. Yes.
>
> Q. What would you have done if he had backed up?
>
> A. If he had backed up, it depends on where I was in the vehicle. If I was just in the rear, I would have had to have let him go. But once I was up to his driver's door and I realized that the smell was coming from that vehicle, I would have got back in our cruiser and -- and initiated a traffic stop.

*Id.* at 38-39. In addition, Officer Wells' testimony also makes clear exactly the circumstances of the officer's approach. That is, he testified that when the two officers approached from behind, there was a distance of approximately five feet between them

No. 18AP-871

(barely, if even a car width). *Id.* at 35-36. Officer Wells also clarified that there was a car parked next to McCall's driver's side and that, as he walked the length of McCall's car toward the driver's side window, he was walking between the two cars. *Id.* at 36-39. In other words, taking the officers' testimony at face value, McCall's means of egress would have been to reverse between police officers standing approximately a car width or less (five feet) apart or to reverse while one officer walked along the passenger side of McCall's car and the other threaded the gap between McCall's car and the one parked next to it.

{¶ 31} Where, as here, officers do not deliberately or overtly seize a person, the United States Supreme Court has instructed how to analyze whether a seizure has taken place for Fourth Amendment purposes:

> When the actions of the police do not show an unambiguous intent to restrain or when an individual's submission to a show of governmental authority takes the form of passive acquiescence, there needs to be some test for telling when a seizure occurs in response to authority, and when it does not. The test was devised by Justice Stewart in *United States v. Mendenhall*, 446 U.S. 544 * * * (1980), who wrote that a seizure occurs if "in view of all of the circumstances surrounding the incident, *a reasonable person would have believed that he was not free to leave*," *id.*, at 554 * * * . Later on, the Court adopted Justice Stewart's touchstone, *see, e.g.*, [*Cal. v. Hodari D.*, 499 U.S. 621, 627 (1991); *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988); *INS v. Delgado*, 466 U.S. 210, 215 (1984).]

(Emphasis added) *Brendlin v. California*, 551 U.S. 249, 255 (2007).

{¶ 32} While Officer Wells testified that there was room for McCall to reverse without striking him, I cannot fathom how any reasonable person would attempt to reverse out of a parking space while two people with only five feet between them approached from behind or while any person was walking the narrow gap between their car and the car in the next space over. Moreover, since the persons approaching McCall's car in this manner were police officers, a reasonable person in McCall's circumstances would have believed he

No. 18AP-871

was not expected to leave and thus not free to leave. Because probable cause did not occur before McCall was seized, that is, McCall was not free to leave *before* Officer Wells actually reached McCall's driver's side window smelled a marijuana odor from the car, I would reverse.

{¶ 33} I also note that the circumstances of this case present a situation where affirmance could set a precedent that might prove physically dangerous to officers and the public. If we find that, with officers arrayed in the positions the testimony has presented here, a defendant was nonetheless free to simply reverse and expect the officers to get out of the way, we are essentially informing the public that it is permissible to drive in a manner that places peace officers at risk in order to avoid an interaction. Officers very near to a vehicle that suddenly springs into motion (legal, though that movement would be under the majority's decision) may understandably react defensively, meeting what is reasonably perceived as force with commensurate or greater force which could additionally have collateral effects on those of the public.

{¶ 34} Analyzing the whole of the transcript, I believe that the trial court erred in finding that when officers place themselves in positions where moving a vehicle would run any significant risk of striking them, the reasonable driver would understand that he or she is still free to go. Thus, I would hold as a matter of law McCall was seized before probable cause developed when Officer Wells finally reached the driver side of McCall's car. As such, he was seized without probable cause, and for this reason, I respectfully dissent.

_____